**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ISIDORO RODRIGUEZ,

        **Plaintiff,**

        v.

EDITOR IN CHIEF, LEGAL TIMES,
et al.,

        **Defendants.**

Case No.    07-CV-00975 (PLF)

**OPPOSITION OF THE LEGAL TIMES TO PLAINTIFF'S MOTION FOR**
**A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

This litigation on its face stems from plaintiff Isidoro Rodriguez's claims that the

improper efforts of various courts, government officials, and others resulted in the revocation of

his license to practice law and otherwise caused him damage.  Underlying these contentions is

plaintiff's apparent disagreement with court decisions involving a custody and visitation dispute

between him and his former wife regarding their son.  Although an article about plaintiff's

widely followed dispute and the litigation that ensued appeared in the Legal Times[1] more than

four years ago, the Legal Times has no involvement in any of the events at issue in this lawsuit.

Nevertheless, plaintiff both sued the Legal Times and now seeks a temporary restraining order

and a preliminary injunction enjoining it from publishing on the Internet "false, misleading, and

defamatory news articles," presumably about him.

---

[1] Plaintiff erroneously names "Editor in Chief, Legal Times" as a defendant.  American
Lawyer Media, Inc. is the publisher of the Legal Times.  For the purposes of this memorandum,
this defendant will be referred to as "the Legal Times."

Plaintiff's motion for a temporary restraining order and preliminary injunction against Legal Times lacks any merit and should be denied. Through the motion, plaintiff seeks a prior restraint against continued publication of a news report, which would constitute "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559 (1976). Prior restraints against publishers such as the Legal Times are, by their nature, all but totally forbidden by the First Amendment. Plaintiff has not even attempted to make the type of showing required for such extraordinary relief, and his request for an injunction against publication should be rejected out of hand.

Even apart from the First Amendment bar to the relief plaintiff is seeking, his request for a temporary restraining order and a preliminary injunction should be denied because he cannot carry his substantial burden on any of the elements required to obtain extraordinary preliminary relief. First, plaintiff cannot show any likelihood of success on the merits of his claims against Legal Times because they are time-barred and because the complaint fails even to state a claim against the Legal Times. Second, plaintiff fails to and cannot establish that maintaining the article in the subscription-accessible archives of the Legal Times online and within the publication inflict any irreparable harm on him. As noted, the article was first published more than four years ago, and there is no reason to think, let alone evidence to prove, that its retention by the Legal Times is causing plaintiff any harm. Third, the injunction would substantially harm the Legal Times by imposing upon it an unconstitutional prior restraint. Fourth, plaintiff fails to demonstrate any public interest warranting injunctive relief. To the contrary, the First Amendment's extremely strong disapproval of prior restraints demonstrates that the public interest lies in not enjoining the archiving of the article but in retaining the status quo.

In short, plaintiff's motion, and indeed his entire lawsuit, is nothing more than an attempt to chill the Legal Times from providing any further news coverage regarding his serial litigation. As the Virginia State Bar Disciplinary Board noted in its order revoking plaintiff's license to practice law in that state, plaintiff's previous use of litigation "clearly demonstrates his use of the legal system to harass and intimidate anyone whom he considered to have been involved in the Virginia litigation that returned his son to Colombia and to re-litigate the Virginia case." *See In re Rodriguez*, VSB Docket Nos. 04-052-794 and 04-052-1044, at 5 (Nov. 28, 2006) (attached as Exhibit 3 to Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction) ("the VSB decision"). For all these reasons, the Court should deny plaintiff's motion for injunctive relief.

## BACKGROUND

The facts underlying this case have been repeatedly reviewed by this Court and other tribunals. *See, e.g.*, *Rodriguez ex rel. Rodriguez-Hazbun v. Nat'l Ctr. for Missing & Exploited Children*, 2005 WL 736526 (D.D.C. Mar. 31, 2005), *aff'd*, *In re Rodriguez*, 2005 WL 3842612 (D.C. Cir. Oct. 14, 2005); *Escaf v. Rodriguez*, 200 F. Supp. 2d 603 (E.D. Va. 2002); *Hazbun Escaf v. Rodriguez*, 191 F. Supp. 2d 685 (E.D. Va. 2002). In sum, plaintiff was involved in a dispute with his former wife regarding custody and visitation rights of their son that resulted in litigation in several jurisdictions. *See* Compl. ¶¶ 71-143. Subsequently, and for several reasons, plaintiff's license to practice law in Virginia was revoked in June 2006. *See* Compl. ¶ 151; *see also* the VSB Decision. In this lawsuit, plaintiff alleges that the improper efforts of various courts, government officials, and others resulted in the revocation and otherwise caused him a wide array of damages. *See* Compl. ¶¶ 1-2.

The Legal Times published an article about the custody and visitation dispute and some of the litigation it generated on April 14, 2003. *See* Compl. ¶ 101 (a copy of the article is attached hereto as Exhibit 1). With regard to the Legal Times, the Complaint now alleges that:

- certain defendants conspired with the Legal Times to publish "a false, misleading, and erroneous news article so to discredit, stigmatize, defame, and further obstruct with [plaintiff's] parental rights by reporting that his litigation was only about a '[f]ather's lawsuit' for custody." *Id.*;

- certain defendants conspired with the Legal Times to publish "false and defamatory news articles . . . with the purpose to stigmatize and punish [plaintiff], so to misinform the public regarding his litigation to secure a father's visitation rights." Compl. ¶ 187; and

- the Legal Times conspired "to defame and stigmatize [plaintiff], by publish [*sic*] and posting false statements." Compl. ¶ 235.

Along with his complaint, plaintiff filed a motion for a temporary restraining order and a preliminary injunction. *See* Dkt. No. 3.

## ARGUMENT

### I. The Preliminary Injunction Sought by Plaintiff Would Constitute an Unconstitutional Prior Restraint on Protected Speech

Separate and apart from the typical, and considerable, hurdles that plaintiff would have to clear to obtain a preliminary injunction (discussed in Part II *infra*), the First Amendment imposes a "virtually insurmountable barrier" to the classic prior restraint on expression sought by plaintiff. *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring); *see also Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226-27 (6th Cir. 1996) (stating that, where a party seeks to enjoin protected speech, "the hurdle is substantially higher" than for an ordinary injunction). By asking the Court to prevent the Legal Times from publishing information about the plaintiff and the litigation surrounding the custody and visitation dispute, plaintiff seeks "one of the most extraordinary remedies known to our

jurisprudence," and one that universally is recognized to be "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n*, 427 U.S. at 559, 562.

The Supreme Court has recognized that the "dominant purpose" of the First Amendment's free-speech clause is to outlaw prior restraints. *See New York Times Co. v. United States*, 403 U.S. 713, 723-24 (1971); *see also In re Providence Journal Co.*, 820 F.2d 1342, 1348 (1st Cir. 1986) ("In its nearly two centuries of existence, the Supreme Court has never upheld a prior restraint on pure speech."), *modified on other grounds on reh'g*, 820 F.2d 1354 (1st Cir. 1987). Thus, plaintiff's request "comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Enjoining publication would disregard an unbroken line of precedent rejecting prior restraints in all but the most "exceptional cases" – such as the intended publication of military plans during wartime. *Near v. Minnesota*, 283 U.S. 697, 716 (1931).

The distinction between a "prior restraint" and "subsequent punishment" is based upon a "theory deeply etched in our law" – that "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them . . . beforehand." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558-59 (1975). The "special vice of a prior restraint," the Supreme Court has explained, "is that communication will be suppressed . . . before an adequate determination [is made] that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973). The party seeking the injunction must therefore demonstrate that the challenged expression "threaten[s] an interest *more fundamental than the First Amendment itself.*" *Procter & Gamble Co.*, 78 F.3d at 227 (emphasis added); *see also CBS Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers) ("Even where questions of allegedly urgent national security or competing

constitutional interests are concerned, we have imposed this 'most extraordinary remedy' only where the evil that would result . . . is both great and certain and cannot be militated by less intrusive measures.") (citations omitted).

Here, plaintiff cannot meet his exceptionally "heavy burden." *New York Times Co.*, 403 U.S. at 714. Plaintiff simply claims that the Legal Times conspired with "other" unspecified defendants "to stigmatize and defame him," allegedly by misinforming the public about his litigation. *See* Compl. ¶¶ 187, 235. Even assuming this occurred (which the Legal Times strenuously denies), plaintiff's allegations, at most, could amount to nothing more than a typical defamation claim (even though he has failed to bring such a claim against the Legal Times). He thus seeks to enjoin a perceived libel, but it is black letter law that courts will not enjoin a libel. *See, e.g.*, *Community for Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir. 1987); *Kukatush Mining Corp. (N.P.L.) v. SEC*, 309 F.2d 647, 651 n.2 (D.C. Cir. 1962); *Metro. Opera Ass'n v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001); *Mazur v. Szporer*, 2004 WL 1944849, at *7-8 & n.6 (D.D.C. June 1, 2004). In short, there are no extraordinary circumstances here that would overcome the nearly insurmountable presumption against prior restraints.

## II.   Plaintiff Fails to Meet His Burden Regarding the Factors Necessary to Obtain Preliminary Injunctive Relief

Even assuming *arguendo* that substantial First Amendment rights were not at stake, a preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004); *see also, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Before the Court may enter a preliminary injunction, "the moving party must demonstrate: (1) a substantial likelihood of success on the merits, (2) that it

would suffer irreparable harm without injunctive relief, (3) that an injunction would not substantially harm other interested parties, and (4) that issuance of the injunction is in the public interest." *Cobell*, 391 F.3d at 258. Although courts apply this four-factor test in evaluating a request for a preliminary injunction, "such relief never will be granted unless a claimant can demonstrate 'a fair ground for litigation.'" *Katz v. Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir. 2001) (citation omitted). In this case, plaintiff has failed to establish that *any* of the four factors supports the issuance of the requested injunction. Indeed, the deficiencies in this request for injunctive relief are particularly striking because plaintiff, in addition to having ignored completely the substantial First Amendment implications of its motion, has plainly failed even to state a claim for which relief may be granted under applicable law.

## A.   Plaintiff Cannot Demonstrate a Substantial Likelihood of Success on the Merits of his Claims Against the Legal Times

Plaintiff cannot demonstrate a substantial likelihood of success on the merits on any of the claims in which he makes allegations about the Legal Times. In Count One, plaintiff lumps the Legal Times together with other defendants in an effort to state a claim for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. As to the Legal Times, plaintiff contends that other defendants conspired with it to publish false and defamatory news articles with the purpose of stigmatizing and punishing the plaintiff, so as to misinform the public regarding his litigation. *See* Compl. ¶ 187. In Count Five, plaintiff alleges violations of 42 U.S.C. § 1983, and asserts that the Legal Times conspired to defame and stigmatize plaintiff by publishing false statements. *See* Compl. ¶ 235. Plaintiff has no likelihood of succeeding on the merits of either of these claims.[2]

_____

[2] While plaintiff did not assert a defamation claim against the Legal Times, he cannot escape the carefully crafted First Amendment-based protections that attach to speech-based

1.      **Plaintiff's Claims are Barred by the Applicable Statutes of Limitations.**

As a preliminary matter, both causes of action are barred by the applicable statutes of

limitation.  The statute of limitations for section 1983 claims in the District of Columbia is three

years.  *See Carney v. American Univ.*, 151 F.3d 1090, 1096 (D.C. Cir. 1998); *Fletcher v. District

of Columbia*, 481 F. Supp. 2d 156, 171 (D.D.C. 2007).  The statute of limitations for civil RICO

claims is four years.  *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143,

153, 156 (1987).  Both limitations periods begin to run from the date the plaintiff knew or should

have known of his alleged injury.  *See Rotella v. Wood*, 528 U.S. 549, 553 (2000); *National

Adver. Co. v. City of Raleigh*, 947 F.2d 1158, 1161-62 (4th Cir. 1991).

---

claims simply by pleading an alternate theory of relief.  Any cause of action seeking damages for
reputational or related injury sustained as a result of a publication or broadcast, no matter how
denominated in plaintiffs' complaint, is subject to all of the defenses that govern claims for
defamation.  *See Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) (rejecting plaintiff's effort
to avoid the requirements of  defamation law by styling his claim as one for intentional infliction
of emotional distress); *Moldea v. New York Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994)
(affirming dismissal of defamation action and refusing to permit amendment to add related
causes of action because "a plaintiff may not use related causes of action to avoid the
constitutional requisites of a defamation claim"); *Foretich v. Advance Magazine Publishers, Inc.*,
765 F. Supp. 1099, 1104 (D.D.C. 1991) (courts may not permit plaintiffs, through creative
pleading, to invoke other torts as a vehicle for "end-running other requirements of defamation
law").  In particular, plaintiffs cannot use civil rights causes of action in this manner.  *See Barr v.
Clinton*, 370 F.3d 1196, 1202-03 (D.C. Cir. 2004) (section 1985 claim subject to First
Amendment protections).

Here, plaintiff's claims have no likelihood of success because they are barred as a matter
of law by a variety of defamation-based defenses.  For instance, a publication is only actionable
if it is reasonably capable of conveying the defamatory meaning alleged by the plaintiff.  *See,
e.g.*, *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990).  To be defamatory,
a statement "must be more than unpleasant or offensive; the language must make the plaintiff
appear 'odious, infamous, or ridiculous.'"  *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984)
(citation omitted); *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001).
A simple review of the April 14, 2003 article demonstrates that it is not defamatory of anyone,
including plaintiff.

The article also could not form the basis for a defamation claim because it is a fair and
accurate report of official government proceedings – namely, the litigation that arose out of the
custody and visitation dispute.  *See, e.g.*, *White*, 909 F.2d at 527; *Dameron v. Washingtonian
Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985).

The Legal Times' remote connection to this case is simply its publication of the article on April 14, 2003. *See* Compl. ¶ 101. Plaintiff filed this case on May 25, 2007, more than four years later. For this reason alone, his causes of action against the Legal Times have no likelihood of success at all.

**2.    Plaintiff Fails to Plead the Substantive Elements of the Claims in Suit.**

Plaintiff has no greater likelihood of success on the substance of his claims.[3]

**a.    Plaintiff Fails to Plead a RICO Violation.**

To state a civil claim for a violation of section 1962(c) of RICO, plaintiff must sufficiently plead "four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Western Assocs. Ltd. P'ship v. Market Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (internal quotations and citation omitted). Plaintiff's allegations regarding the Legal Times fail to satisfy any of these elements, and thus fall far short of stating such a claim.

First, plaintiff alleges no facts sufficient to establish the "conduct" element. It is well-settled that "one is not liable" under section 1962(c) "unless one has participated in the *operation or management* of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993) (emphasis added); *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 913 F.2d 948, 952-56 (D.C. Cir. 1990) (*en banc*). The only "conduct" that plaintiff has attempted to plead is that other defendants conspired with the Legal Times to publish false and defamatory news articles about him. *See* Compl. ¶ 187. Thus, even if an enterprise existed (which it did not), plaintiff nowhere alleges any facts that the Legal Times participated in the operation or management of it.

---

[3] Indeed, the Legal Times will move to dismiss the Complaint at the appropriate time.

Second, plaintiff fails to identify a RICO "enterprise."  A RICO "enterprise" may be "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Among other things, plaintiff has not, nor could he, allege an association in fact involving the Legal Times. "An 'association in fact' enterprise is established through proof of '(1) a common purpose among the participants, (2) organization, and (3) continuity.'"  *Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7, 24 (D.D.C. 2000) (quoting *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999)).  It is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  These elements of "structure" are important in order to "'distinguish an enterprise from a mere conspiracy.'"  *Richardson*, 167 F.3d at 625 (quoting *United States v. Korando*, 29 F.3d 1114, 1117 (7th Cir. 1994).  Plaintiff alleges no facts demonstrating that the enterprise had any organization, structure or continuity "to distinguish it from a mere conspiracy" aimed at him.  As such, he has failed to plead the existence of any ongoing, legally cognizable RICO "enterprise."

Third, plaintiff cannot allege a "pattern" of racketeering activity by the Legal Times. Under RICO, a "pattern" of racketeering activity requires that the defendant participated in "at least two acts of racketeering activity" within a 10-year period.  18 U.S.C. § 1961(5); *see also Dodd v. Infinity Travel*, 90 F. Supp. 2d 115, 117 (D.D.C. 2000).  The only activity by the Legal Times alleged by plaintiff – indeed, its only wafer-thin connection to this case – is the publication of the single article about him.  Thus, plaintiff has not alleged the requisite two acts of racketeering activity.  *See Western Assocs. Ltd., P'ship*, 235 F.3d at 631 (complaint that only

"alleged a single scheme, a single discrete injury, and a single victim" insufficient as a matter of law to state RICO claim).

Moreover, courts have repeatedly held, as a matter of law, that even fraud or other criminal conduct purportedly committed by a media entity in the course of preparing a publication cannot constitute the requisite "pattern" of racketeering activity because it does not constitute a "'continuity of racketeering activity, or its threat.'"  *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 123 (5th Cir. 1996) (dismissing RICO claim where "alleged acts were all part of a single, lawful endeavor – namely the production of television news reports concerning a particular subject") (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241 n.4 (1989)); *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1274 (10th Cir. 1989) (characterizing plaintiff's RICO claim against newspaper arising out of publication as "border[ing] on being frivolous," and dismissing claim); *Food Lion, Inc. v. Capital Cities/ABC*, 887 F. Supp. 811, 818-20 (M.D.N.C. 1995) (dismissing RICO claim because alleged predicate acts of mail and wire fraud "were part of a limited purpose, to obtain information . . . to be aired").  For each of these reasons, plaintiff has failed to sufficiently allege a "pattern" of racketeering activity under RICO.

Fourth, plaintiff does not plead facts that transform the act of publishing by the Legal Times into predicate criminal offenses – or "racketeering activity" – under RICO.  "Only the types of conduct listed in § 1961(1) are proper RICO predicates."  *Committee to Defend the U.S. Constitution v. Moon*, 776 F. Supp. 568, 572 n.4 (D.D.C. 1991).  The publication of a news story is not a predicate criminal offense.  To the contrary, the plaintiff "largely alleges conduct" by the Legal Times "that on its face appears entirely lawful."  *Chisum v. Colvin*, 276 F. Supp. 2d 1, 4

(D.D.C. 2003) (dismissing RICO claim).  For all of these reasons, plaintiff's civil RICO claim against the Legal Times has no chance of success on the merits.

### b.    Plaintiff Fails To Allege a Section 1983 Claim.

Plaintiff's section 1983 claim fares no better in its likelihood of success.  Plaintiff first fails to allege any facts that would support his conclusory allegation that the Legal Times was involved in a conspiracy to deprive him of a right.  As Judge Roberts properly previously held with regard to plaintiff's similar claims in another lawsuit, "conclusory allegations of a conspiracy, unsupported by the alleged facts, are insufficient to recognize a cause of action against these private individuals."  *Rodriguez v. Nat'l Ctr. for Missing & Exploited Children*, 2005 WL 736526, at *10 n.1; *see also, e.g.*, *id.* at *11 ("complaints containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights will be dismissed") (internal quotations and citation omitted); *Williams v. Washington Post Co.*, 1990 WL 95632, at *2 (D.D.C. June 28, 1990) (same); *Risley v. Hawk*, 918 F. Supp. 18, 22 & n.1 (D.D.C. 1996) (dismissing plaintiff's claims for failure to state a claim upon which relief can be granted, as plaintiff failed to assert any factual basis to support the conclusion that a conspiracy existed) (citing *Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C. Cir. 1987)).  In this case, again, plaintiff has failed to assert any facts to support his conclusory allegation that the Legal Times "did conspire to defame and stigmatize" him.  Compl. ¶ 235.  For this reason alone, his section 1983 claim has virtually no chance of success on the merits.

Plaintiff also has not stated a section 1983 against the Legal Times because he alleges no facts establishing the Legal Times engaged in "state action" sufficient to impose constitutional obligations upon them.  A private party engages in state action "'only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly

treated as that of the State itself.'" *Williams v. United States*, 396 F.3d 412, 414 (D.C. Cir. 2005)

(quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)).

Courts commonly reject the suggestion that publishing news reports, even those based on

information from government officials, is "state action." *See, e.g.*, *Phelps*, 886 F.2d at 1271

(private newspaper does not engage in state action by publishing article "based upon information

obtained from government officials"); *Brown v. Rehnquist*, 2002 WL 32394848, at *5 (E.D.N.Y.

May 1, 2002) (reporters "do not act under color of state law merely because they obtained the

information for their articles from the police"); *Skinner v. Dwyer*, 1992 WL 265995, at *2

(N.D.N.Y. Sept. 9, 1992) (newspaper not state actor "when it publishes news received from

police or other state officials").  Here, the plaintiff merely alleges that the Legal Times published

an article about him and the custody and visitation dispute.  There is, therefore, no nexus

between the Legal Times and the state, let alone one close enough to transform publication of the

article into state action.

**B.    Plaintiff Cannot Demonstrate He Would Suffer
        Irreparable Harm Without Injunctive Relief**

In addition to failing to show that he has a substantial likelihood of success on the merits

of any of this claims against the Legal Times, plaintiff cannot demonstrate that he would suffer

irreparable harm without injunctive relief.  The Court of Appeals "has set a high standard for

irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  First, "the injury

'must be both certain and great; it must be actual and not theoretical.'" *Id.* (citation omitted).

The injury must be "of such *imminence* that there is a clear and present need for equitable relief

to prevent irreparable harm." *Id.* (internal quotation and citations omitted) (emphasis in original).

Second, "the injury must be beyond remediation . . . . The key word in this consideration is

*irreparable*." *Id.* (internal quotation and citations omitted).  If a party fails to make a showing of

irreparable harm, "that alone is sufficient" for a court to deny a preliminary injunction. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Plaintiff has not alleged any actual and irreparable injury he would suffer arising out of the Legal Times' maintenance of the article in its paper archives or on its subscription-based website, where it has been maintained since April 2003.[4]  It is hard to imagine what actual additional injury plaintiff could suffer from not removing the article, nor how that injury would be irreparable.  Accordingly, he has not met the high standard for injunctive relief.

### C.    Plaintiff Cannot Demonstrate that an Injunction Would Not Substantially Harm the Legal Times or that the Issuance of an Injunction is in the Public Interest

Plaintiff also cannot demonstrate the third and fourth factors necessary for the issuance of a preliminary injunction:  that the injunction would not substantially harm the Legal Times and that issuing it is in the public interest.  As discussed *supra*, such an injunction would be an unconstitutional prior restraint.  It would therefore substantially harm the Legal Times' First Amendment interest in publishing news.  *See, e.g.*, *CBS Inc.*, 510 U.S. at 1317 (delay in broadcasting a news report would cause the media irreparable harm); *Elrod v. Burns*, 427 U.S. 347 (1976).  Similarly, for all of the reasons discussed above, a prior restraint would damage the public interest in these circumstances.

---

[4] For the purpose of the statute of limitations, maintaining the article on the website is not a continuing or new publication.  The statute of limitations begins to run on the date that a statement is first published, which includes publication on the web, and only a single cause of action can be based on it.  *See, e.g.*, *Jin v. Ministry of State Sec.*, 254 F. Supp. 2d 61, 68 (D.D.C. 2003) (noting that the District of Columbia has adopted the single publication rule); *Lapointe v. Van Note*, 2004 WL 3609346, at *9 (D.D.C. Nov. 9, 2004) (continuous tort doctrine does not apply to defamation claims); *Firth v. N.Y.*, 775 N.E.2d 463 (N.Y. 2002).

## **CONCLUSION**

For the foregoing reasons, the Legal Times respectfully requests that the Court deny

plaintiff's motion for a temporary restraining order and a preliminary injunction.

Dated:   June 14, 2007                          Respectfully submitted,


LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.


By: /s/ Gayle C. Sproul
    Gayle C. Sproul (D.C. Bar. No. 495965)
    Adam J. Rappaport (D.C. Bar. No. 479866)
1050 Seventeenth Street, N.W.
Suite 800
Washington, D.C.  20036
(202) 508-1100

*Counsel for Defendant The Legal Times*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 14, 2007, I caused an electronic copy of the foregoing

Opposition of the Legal Times to Plaintiff's Motion for a Temporary Restraining Order and a

Preliminary Injunction to be served by the Court's Electronic Case Filing System upon all parties

scheduled for electronic notice, and on plaintiff *pro se* by first-class mail, postage prepaid, at the

following address:

> Isidoro Rodriguez
> 7924 Peyton Forest Trail
> Annandale, VA  22003-1560

> /s/ Adam J. Rappaport
> Adam J. Rappaport

# EXHIBIT 1

# LegalTimes.com

Select '**Print**' in your browser menu to print this document.

©2007 Legal Times Online
Page printed from: http://www.legaltimes.com

Back to Article

---

## About a Boy

Tom Schoenberg

04-14-2003

About a month after Isidoro Rodriguez-Hazbun came to visit his father in Northern Virginia, he sent a fax to his mother in Colombia.

"Mommy, I love you much and you know that I am always going to love you and to be your son, but now I want to spend time with my dad," the 12-year-old wrote in Spanish in the summer of 2001, explaining how he could get a better education in the United States and how it was safer living in Virginia than in Colombia. "Besides," he continued, "I am growing into a man and let's accept you are not [a] man."

That was nearly two years ago. Amalin Hazbun has since been reunited with her son, but the family's international custody battle is far from over.

A federal judge in Virginia has ruled that the boy's father, 57-year-old Virginia lawyer Isidoro Rodriguez, had no custody rights in the United States because an existing court order in Colombia gave the mother primary custody. The judge based his ruling on the Hague Convention, an international treaty signed by both the United States and Colombia.

But Rodriguez claims his son, an American citizen, has a constitutional right to live in the United States — a right he says trumps the treaty. He also says his son is at risk of being kidnapped or killed while being forced to live in Colombia. He says similar fears of personal safety have prevented him from litigating the matter there. After losing an appeal in the 4th Circuit, Rodriguez is waiting to see if the U.S. Supreme Court will take the case.

In the meantime, the former Reagan administration official has tried another strategy to get his son back.

In January, he filed suit in the U.S. District Court for the District of Columbia against the lawyers who worked to return his son to Colombia, alleging that they conspired to violate his and his son's constitutional rights. Those defendants include the U.S. State Department, the National Center for Missing and Exploited Children, and the center's outside law firms, Proskauer Rose and Miles & Stockbridge. Rodriguez also claims he and his son were discriminated against because they are Hispanic.

"I'm not going to let my son languish in Colombia," says Rodriguez, who is seeking $4 million in damages.

Last week, Rodriguez filed a petition for a writ of mandamus with the U.S. Court of Appeals for the D.C. Circuit, asking that the court order his son's immediate return to the United States and require the State Department to protect his son in the interim. Rodriguez is also trying — unsuccessfully, thus far — to get the federal court to include his son as a named plaintiff in the civil case.

Lawyers for the National Center for Missing and Exploited Children have filed a motion to dismiss.

"We don't believe this case has any merit," says D. Jean Veta, the Covington & Burling partner representing the nonprofit group and the nine other private defendants including the law firms. Rodriguez, says Veta, unsuccessfully litigated "most, if not all" of the issues in the D.C. suit earlier before U.S. District Judge T.S. Ellis III of the Eastern District of Virginia.

Assistant U.S. Attorney Marina Braswell is representing the State Department and at least five other named government defendants. The U.S. Attorney's Office declines comment.

International family law experts say Rodriguez's suit is unlikely to succeed.

Adair Dyer, a former deputy secretary general of the Hague Conference on Private International Law, says he has never heard of such a challenge against the Hague Convention. Dyer, now in private practice in Austin, Texas, adds that the Hague Convention, approved by Congress and ratified by the president in 1988, has protections to ensure that the rights of parents and children are not violated.

"I personally think it would be very difficult to make a successful challenge to the constitutionality of the convention," says Dyer.

Judge Richard Roberts, who is presiding over the D.C. case, has not scheduled a hearing.

As for Hazbun, the lengths to which her ex-husband has gone to claim their son comes as no surprise.

"I don't think he's a bad father," Hazbun said in an interview with *Legal Times* that was translated from Spanish. "I don't think he's ever abused his son. I've never said he doesn't love his son. It's only that he hates me more, and that makes him do absurd things."

Rodriguez knows controversy.

In 1983, he was pressured to resign from his job as director of minority affairs in the U.S. Agriculture Department after he wrote an internal memo proposing that his agency take the lead in scaling back minority hiring and civil rights enforcement, according to several news reports at the time. Rodriguez's proposal became public when President Ronald Reagan, who was not aware of the memo, was asked about it during a press conference. Rodriguez says in a motion filed in the current case that he was fired for having the "political courage and concern for the direction of our country in confronting the abuses in race base [sic] programs." (A year earlier, the D.C. Court of Appeals upheld a D.C. agency decision that Rodriguez improperly claimed $1,267 in unemployment benefits from the D.C. government in 1980.)

Rodriguez says he began working in Colombia in 1983 as an in-house lawyer to a U.S. construction company doing business in the northern coastal city of Barranquilla.

It was there that he met Amalin Hazbun, an optometrist living in Barranquilla. The two married in 1988. At the time, it was Hazbun's second marriage and Rodriguez's third. Their son, also named Isidoro, was born in March 1989. Rodriguez, who by that time was working full time in Colombia, secured U.S. citizenship for his son. The family lived in Barranquilla with Hazbun's two teen-age daughters from an earlier marriage.

In 1995, Rodriguez returned to the United States to argue a case before the Supreme Court. The case involved an agent of the Drug Enforcement Administration who was in a car accident that injured three Colombians. The question being litigated was whether those victims could sue the individual agent in U.S. federal court. The U.S. government claimed immunity on behalf of the DEA agent. In a 5-4 decision, Rodriguez, who represented the plaintiffs, won.

Around the same time, Rodriguez and Hazbun's marriage began to fall apart, according to court papers in the custody case. They separated in 1996 and divorced less than a year later. A custody agreement was filed with the Colombian family court in 1997, stating that Isidoro would live with Hazbun and that Rodriguez would have regular visitation rights and other responsibilities. A subsequent judicial order clarified that Hazbun had formal custody of Isidoro.

In 1999, Rodriguez moved back to Virginia. He says he came back to help with Republican Party campaigns, but he adds that threats made against him in Colombia were part of the reason for his return. Hazbun allowed Isidoro to visit his father twice in the United States twice in 2000. That same year, Rodriguez married his legal assistant, Irene, a Colombian lawyer. (The two had a child — a boy — in December 2002.)

Rodriguez says Isidoro told him on several occasions that he wanted to live in the United States. At that point, Rodriguez says, his son activated his rights as a U.S. citizen to remain in America, and, he argues, no court had the right to send him back.

"I wanted my son to grow up and love this country," Rodriguez says, "and show him what a wonderful country we have because of the Constitution."

Isidoro was at the tail end of a month-long visit in 2001 when Hazbun received the fax declaring his intention to remain in the United States. That same day, Rodriguez filed for custody in Fairfax County Court.

"He didn't have the delicacy or the heart to pick up the phone and say to my son, 'Let's call your mother and tell her what we're doing,' " said Hazbun. "I was confronted with a horrible situation — another country, a different language.

"I was crying," Hazbun added. "I was destroyed."

Hazbun turned to the family services agency in her hometown for help. She filed a Hague Convention application in Colombia. The National Center for Missing and Exploited Children, which processes all Hague Convention applications for the U.S. government, reviewed her case and found Virginia family lawyer Patrick Stiehm to represent her pro bono.

Hazbun sued Rodriguez in federal court in Virginia in December 2001.

A six-day bench trial was held before Judge Ellis in April 2002. Rodriguez argued that the custody order in Colombia was no good because the courts were corrupt. He also said the Fairfax custody action should be dealt with before the Hague matter. At trial, Rodriguez claimed that Isidoro would be in danger of being kidnapped or killed by Rodriguez's enemies if returned to Colombia. One of the witnesses was the younger Isidoro, who testified that he would like to spend alternate years with his parents, according to court records.

Judge Ellis found in favor of Hazbun, concluding that there was no evidence Isidoro was in any particular danger. Most important, the judge decided that Isidoro was not mature enough to decide where he should live.

"Indeed, some of his statements regarding reasons for staying in the United States appear to be the product of suggestion, echoing the preferences of his father," Ellis wrote in his May 6 decision.

Rodriguez tried to stay the order pending appeal, but was denied. In July 2002, Isidoro returned to Barranquilla.

The U.S. Court of Appeals for the 4th Circuit upheld Ellis' order, finding that "the proceedings in district court did not violate either Rodriguez's or Isidoro's rights." In February, Rodriguez petitioned the U.S. Supreme Court — that request is pending.

Last month, Judge Roberts denied Rodriguez's request to represent his son in the civil case, ruling that Isidoro, now 14, would need independent counsel. M. Blair Sibley, a business partner of Rodriguez's, has now moved to represent Isidoro, though the defendants have asked that he, too, be blocked from doing so.

In the D.C. case, Rodriguez argues that he and his son were discriminated against because they are Hispanic. When asked how that could happen when Isidoro's mother is also Hispanic, Rodriguez replies, "Do you think they would send an O'Reilly or a Sibley back to Colombia?"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ISIDORO RODRIGUEZ,** | |
| **Plaintiff,** | |
| **v.** | **Case No.   07-CV-00975 (PLF)** |
| **EDITOR IN CHIEF, LEGAL TIMES,** et al., | |
| **Defendants.** | |

**[PROPOSED] ORDER**

UPON CONSIDERATION OF Plaintiff's Motion for a Temporary Restraining Order and

a Preliminary Injunction, and the Opposition of the Legal Times thereto, it is hereby ORDERED

and ADJUDGED that Plaintiff's Motion is DENIED.

Dated: _____, 2007

_____
Paul L. Friedman
United States District Court Judge